The provision in the bill of lading, that the weight therein specified was subject to correction, gave the plaintiff the right to bring an action to correct the mistake; but it also gave the consignee a similar right. Therefore, when the plaintiff undertook, upon the trial of the case, to prove that there was a mistake in the weight of the machinery, the defendant had the right to prove the correct weight. The rights of the parties in this respect were mutual. A contrary ruling would have the effect of depriving the consignee of his property without due process of law, and of an equal protection under the law. There was error, therefore, in the refusal to submit the issues of fact to the jury, and this exception is sustained.

The next exception is as follows:

2  "That his Honor, the County Judge, erred in holding that the defendant was liable for the excess freight, it being respectfully submitted that the defendant was not a party to the contract, and was only liable to pay such freight as was demanded of him, and any excess of that amount should have been paid by the consignor or the consignee, they being one and the same person in this instance."

The case of *Brown v. Railroad Co.*, 91 S. C., 377; 74 S. E., 754, cited in the order of his Honor, the County Judge, shows that this exception cannot be sustained, but is overruled.

Remanded for a new trial.

---

11394

MAXWELL *ET AL.* v. STANDARD FURNITURE CO. *ET AL.*

(120 S. E., 834)

1. SPECIFIC PERFORMANCE—PROOF AS TO ONE OF TERMS OF SALE OF GOING CONCERN HELD INSUFFICIENT TO AUTHORIZE DECREE.—In buyers' action on a written option to buy a going concern, which option omitted any reference to the concern's debts, proof as to who should pay these debts *held* not made out by such clear and convincing evidence as entitled buyers to specific performance.

2. EVIDENCE—PAROL EVIDENCE ADMISSIBLE UPON POINT AS TO WHICH WRITTEN CONTRACT IS SILENT.—Where a contest is over the question whether the written contract contains the whole agreement between the parties, parol evidence upon a point as to which the writing is silent, and which does not in any way contradict or vary the writing, is admissible to show what the agreement was.

3. SPECIFIC PERFORMANCE—NOT GRANTED WHERE CONTRACT FAILS TO EXPRESS TRUE AGREEMENT THROUGH FRAUD OR MISTAKE.—Where the contract fails to express the true agreement of the parties by reason of fraud, accident, or mistake, the Courts will not decree specific performance.

4. SPECIFIC PERFORMANCE—NOT GRANTED WHERE CONTRACT IS INDEFINITE OR INCOMPLETE.—Where the contract is indefinite, uncertain, or ambiguous, or does not embrace all the terms, it will not be specifically enforced.

5. SPECIFIC PERFORMANCE—DECREE MATTER OF JUDICIAL DISCRETION EXERCISED AFTER CONSIDERING PARTICULAR FACTS.—The right to specific performance is a matter of sound judicial discretion, controlled by principles of equity, and exercised on a consideration of all the circumstances of each particular case.

Before C. M. EFIRD, SPECIAL JUDGE, Greenville, March, 1923. Affirmed.

Action by B. Maxwell and others doing business under name of Maxwell Bros. & McDonald, against Standard Furniture Company et al. Judgment for defendants and plaintiffs appeal.

The Circuit decree was as follows:

This is an action brought by the buyers against the sellers for the specific performance of an alleged agreement to sell the stock of goods, with the accounts, good will, and other property of the seller, the defendant, Standard Furniture Company. G. K. Willis is also made a party defendant, there being a term in the option which served as the basis of plaintiff's claim that he will not do business in the City of Greenville for five years after the sale. The matter was referred to the Master, who took the testimony and reported to the Court, concluding "that the contract is valid and enforceable and that the plaintiffs are entitled to have specific

performance of said contract." The incidental relief sought by the complaint, to wit, injunction and receivership, are not mentioned by him. The exceptions challenge his findings of fact and his conclusions of law, and they will be considered below.

The undisputed facts, in substance, are as follows:

Defendant is a corporation with a capital stock of $7,000, of which G. K. Willis owns $5,500, Mrs. G. K. Willis $1,000, and J. W. Pitman $500. Mr. Willis is president and treasurer of the corporation, and Mr. Pitman secretary, and Mrs. Willis worked for the company as bookkeeper. It is a going concern apparently doing a good business, and being solvent, the evidence showing that the book value of the stock is something over $500 for each share, the par value of each share being $100. However, as his health has been failing, Mr. Willis wished to bring about a sale of the business, and, to that end, on July 11, 1921, opened up correspondence with the plaintiffs at Augusta, Ga., inviting negotiations. The plaintiffs responded immediately, and on July 14, 1921, Mr. Willis wrote them again, giving an estimate of the stock of goods, his accounts, and his debts as of January 1st of that year. In response to another letter, Mr. Willis wired Maxwell Bros., July 18, 1921 (Monday), making an appointment with them at Greenville for July 22, 1921 (Friday). On July 22d, G. C. Maxwell came to Greenville, took up the matter with Mr. Willis, and on that day an agreement called an option was drawn and signed, "Maxwell Brothers & McDonald, by G. C. Maxwell," and signed further, "Standard Furniture Company, by G. K. Willis, President and J. W. Pitman, Secretary." This writing states that for the sum of $25 the furniture company sells to these plaintiffs an option for 15 days to purchase the property therein described: "All goods, wares, merchandise, fixtures, delivery trucks, active accounts, rights of lease, and good will" of the furniture company. The company had a lease on its store building which would ex-

pire at the end of 1923. The price and terms were stated to be as follows: "The parties of the second part are to pay forty (.40) cents on the dollar for all active ledger accounts of the said Standard Furniture Company. And the parties of the second part are to pay unto the party of the first part today's factory price for all the new stock of goods and merchandise of the party of the first part, and are to pay a fair and reasonable price, to be agreed upon, for all the old and damaged stock of goods and merchandise, including secondhand goods and furniture. The parties of the second part are to pay a fair and reasonable price for all the office furniture and other fixtures and for all the delivery trucks of the said Standard Furniture Company." It was provided that if Maxwell Bros. & McDonald—who will be hereafter referred to as Maxwell Bros.—should exercise the option, that G. K. Willis will not engage in the furniture business in Greenville for a period of five years. And providing further: "Said sale of the property, assets and rights of the party of the first part, and delivery of same is to be made on the exercise of this option or privilege by the parties of the second part and on their compliance with the terms and conditions hereinabove set out." On August 1, 1921, Maxwell returned to Greenville with his partner, D. H. McDonald, to complete the negotiations and consummate the deal. In evident good faith both sides took up the negotiations, proceeded to take stock, make inventories, and to try to agree upon prices for certain goods, trucks, fixtures, etc., the price of which was not stated in the writing of July 22, 1922. It took three days, August 1st to 3d, to take the stock and make the inventories; the parties planned to perfect the negotiations and execute a bill of sale next day, August 4th, the transfer, upon completion of the agreement, to become effective as of August 3, 1921, the date of the inventory. On the morning of August 4th, Maxwell went to the Farmers' & Merchants' Bank and took up a $2,300.00 note which was part of the

company's indebtedness, substituting his own note therefor; he and Willis then met in Mr. Leatherwood's office to perfect and execute their agreement. There then developed a very serious difference between them, Maxwell contending that debts of the Company would be assumed by Maxwell Bros. and were to be deducted from the gross amount due from them; that Maxwell Bros. "were buying net assets"; while Willis claimed that Maxwell Bros. were to assume the debts and pay them, but that the purchase money for the goods, accounts, etc., was to be net to the Company. At this time the parties had not reached an agreement as to the prices of certain articles referred to below, which the furniture company alleges were worth more than $2,000.00, and, upon the advice of counsel, Mr. Willis broke off the negotiations and withdrew. This brings us to the most important issue of fact in the case: "Was there a fair and clear and complete agreement between the parties in regard to this very material matter of the payment of the debts which amounted to more than $11,000.00? Is the evidence clear and convincing that the minds of the parties met upon this issue, or is it conflicting and not free from doubt?" The evidence upon this question is substantially as follows: Maxwell testified that he never heard anything about the liabilities until the morning of the 4th; that the debts were not listed until then and the matter was never mentioned to him until he went to Leatherwood's office with Willis to make the final arrangements; that it "was an immaterial thing" as regardless of what they amounted to "they would have to come from the assets"; that there wasn't anything to consider (with respect to the amount of the debt) when we were buying net assets"; that the first time Willis made any claim that Maxwell Bros. were to pay the debts was in Leatherwood's office on the morning of the 4th. He testified further, however, that the matter of the debts was discussed when he was in Greenville the first time, July 22d, and that he (Maxwell) stated that "ordinarily in buying a

business having liabilities the business was responsible for the liabilities, and the only way would be for the new firm to assume the liabilities, deducting them from the gross assets"; he does not state that Willis agreed to this. Mr. McDonald who helped to take stock, August 1st to 3d, inclusive, testified at no time while they were so engaged during those three days did Mr. Willis (in McDonald's presence) claim that buyers were to pay the debts and that the first he heard about it was "after the 4th day," he thinks. This is all plaintiff's testimony upon this issue. G. K. Willis testified that Maxwell agreed positively from the very beginning that he would take care of the debts, would pay the prices named for the Company's goods and other property. He says that Maxwell is mistaken about not having heard anything about the amount of the liabilities until the morning of the 4th of August, since in his letter of July 14th he (Willis) had given Maxwell the figures showing practically the amount of the indebtedness (that would have to be taken care of); that he would not originally have agreed to sell his accounts, which are worth 65 cents on the dollar, for 40 cents, but for the fact that Maxwell Bros. were to pay the debts; that the option was brought in one evening and he and Pitman signed it; that he read it very hurriedly just about night, and did not notice that the provision about the debts was then omitted until he read it again the next day; that on scrutinizing it very carefully, he noticed that part of it was left out; that on the following Sunday (which was the 24th) he consulted Mr. Jas. H. Price in regard to same and that he took the matter up with Maxwell again when he came back in August, when it was again clearly stipulated and agreed that Maxwell Bros. should pay the debts. Mr. Price testified that Mr. Willis came to his home to see him on Sunday morning immediately after the date of the option, and wanted to know whether the purchaser would have to pay the debts of the Company under the terms of the agreement, and that

he told him that it was not stipulated; that Willis stated that they had agreed on that verbally; that he advised Willis that they could fix another written paper, but he thought that if they reached a perfect agreement that the purchaser was to pay the debts which was not embodied in the option, that that was binding without any further written obligation; that a verbal agreement covering that particular question will be binding upon both of them. Willis testified that when the option was presented he glanced over it hurriedly, very hurriedly; that he gave it a superficial glance. His testimony shows that he rested content on Mr. Price's advice, but that he took the matter up with Maxwell and again had the verbal understanding confirmed on Maxwell's return to Greenville; that pursuant to this agreement he made a list of the debts, and Maxwell went to the Farmers' & Merchants' Bank on the morning of the 4th to pay off the note; that he had employed Martin & Blythe as counsel, and Mr. Martin went with him and began to inquire about the liabilities, when it developed that Maxwell claimed the right to pay the debts and deduct them from the gross proceeds of the sale; that they were about $11,000.00 apart; that he (Willis) jumped up and said to Maxwell that he would die before he would be swindled in any such style as that. Witnesses agreed that there was a violent scene and negotiations were broken off. Maxwell testified that while they were working on the inventories, the matter was discussed about deducting the liabilities from the assets, and that he would not say that J. L. Willis and Mrs. G. K. Willis were not present. J. L. Willis and Mrs. Willis both testified that they were present, and it was understood that Maxwell Bros. should pay the debts and that the proceeds of sale "were to be net to the Standard Furniture Company"; and J. L. Willis says that G. K. Willis told Maxwell that as he was to take care of the debts they would go to the bank and take up the note. This note was afterwards assumed by the furniture company.

16—S. C. R., 127.

Quite a number of exceptions were filed to the Master's report, questioning practically all of his findings of fact and conclusions of law. I shall not consider all of these in detail, but the point covered by Exception 2, "because of error in finding that there was an agreement herein between the plaintiffs and the Standard Furniture Company, whereas he should have found that the minds of the parties never met—that no complete trade was ever consummated."

Where the contest is over the question whether the writing contains the whole agreement between the parties, parol evidence is admissible to show what the agreement was: Provided such evidence is upon a point as to which the writing is silent and which does not in any way contradict or vary the writing. *Sloan v. Courtenay,* 54 S. C., 314; 32 S. E., 431. *Earle v. Owings,* 72 S. C., 362; 51 S. E., 980. *Eureka Elastic Paint Co. v. Bennett-Hedgepath Co.,* 85 S. C., 486; 67 S. E., 738. *Bennettsville Hardware Co. v. Gray,* 90 S. C., 454; 73 S. E., 872. *Ashe v. Railway Co.,* 65 S. C., 134; 43 S. E., 393.

Plaintiffs cannot stand on the option alone, for the option is silent with reference to the debts. Both parties seek to add a provision as to them. Maxwell contends that he has a right to ascertain the debts and to make payment of the gross amount provided in the writing less the amount of such debts, but if he has any such right it is not covered by the option. Willis contends that a provision should have been incorporated to the effect that the purchaser assume the debts and that the proceeds were to be net to the furniture company. Both parties, therefore, by this contention impliedly concede that the writing is not sufficient; that it is not complete and the Court cannot escape the conclusion after reading the entire testimony that there was a failure to agree upon this issue. The testimony of G. K. Willis, corroborated as it is by his letter of July 14th, by his consulting Mr. Price immediately after the option was signed, by testimony of Mrs. Willis and of J. L. Willis, his nephew,

and by his vigorous and emphatic repudiation of any other agreement, when Maxwell unexpectedly brought up the matter at the final meeting on August 4th, strengthens this view.

It is a well-settled principle of equity that the Courts will not decree specific performance if the contract fails to express the true agreement of the parties by reason of fraud, accident, or mistake. *Anthony v. Eve,* 109 S. C., 255; 95 S. E., 513. *Marthinson v. McCutchen,* 84 S. C., 265; 66 S. E., 120.

Also if the contract is indefinite, uncertain, or ambiguous, or does not embrace all the material terms, it will not be enforced. 6 Pom. Eq. Jur., §§ 764, 778. *Welch Pub. Co. v. Johnson Ry. Co.,* 78 W. Va., 350; 89 S. E., 707; L. R. A. 1917A, 200, 204.

The right to the remedy of specific performance is a matter of sound judicial discretion controlled by established principles of equity and exercised by a consideration of all the circumstances of each particular case. 6 Pom. Eq. Rem., § 762.

I, therefore, find as a matter of fact that the minds of the parties to this contract did not meet as to who should pay the debts, and this is a very material point in the contract of sale and purchase of a going concern. By reason of this omission in the writing, the contract as gathered from the evidence is not made out by the plaintiffs by such clear, convincing, and uncontradicted evidence as entitles them to specific performance.

Exception 2 of the defendants to the Master's report is sustained.

Under the view which the Court has taken of the case, it is unnecessary to consider the other exceptions.

Also under this view of the case, it is not necessary to pass upon the motion of the plaintiff for the appointment of a receiver.

Mr. G. K. Willis, as appears from the evidence, has not used such care as a business man of his standing should have used in the preparation and execution of so important a paper as an option for the sale of an important business enterprise.. If he had taken the precaution to consult Mr. Price and Mr. Martin as to the form and contents of his option before its execution by him, he would have saved himself much worry and trouble, and the Court the time and labor necessary to hear and determine this case.

For these reasons it is, therefore, ordered that the defendant, G. K. Willis, pay the cost of this proceeding.

It is further ordered that the complaint be dismissed.

*Haynesworth & Haynesworth, J. G. Leatherwood* and *J. S. Watkins,* for appellant, cite: *Party cannot avoid contract on ground of his own negligence or omission to read it:* 65 S. C., 103; 115 S. C., 426; 113 S.C., 317; 26 S. C., 91; 62 S. C., 1; 124 N. W., 264; Jones, Evid., Sec. 26; 22 C. J., 143; 44 U. S., Ct. Cl., 127. *Self-serving statement, oral or written, is not admissible:* 22 C. J., 22; 1 Mills C. Rep., 162; 75 S. C., 342; 81 C. C. A., 311. *Agreement to pay fair and reasonable price insufficiently definite:* Benj., Sales., Sec. 85; 67 L. R. A., 353; 76 C. C. A., 516; L. R. A. 1917-D, 1074; 100 Am. Dec., 252; 32 L. R. A., 740; 6 R. C. L., Const., Sec. 62. *Contract severable:* 73 S. C., 1; 13 C. J., 563; 35 Cyc., 115. *Acts constituted part performance of contract:* 10 Wisc., 422; 123 Pac., 415. *Formal corporate action not necessary where there is consent:* 175 U. S., 40; 2 Pom. Eq. Jur., 4th Ed., Sec. 819; 3 Fletcher, Corp., Sec. 1641; 140 Pac., 956; 71 S. E., 161. *Estoppel by silence:* 12 S. C., 314.

*Messrs. Martin & Blythe,* for respondent, cite: *Contract too incomplete, uncertain and indefinite to be enforced:* 6 Pom. Eq. Jur., Secs. 764, 765; 56 S. E., 524. *Contract not completed:* 67 S. C., 440; 101 S. C., 170; 32 S. C., 534; 112 S. C., 162. *Contention of parties that contract should be entire:* 13 C. J., 562, 563, 564; 35 Cyc., 113–115.

*Case not taken out of Statute of Frauds:* 48 S. C., 511; 27 S. C., 363; 85 S. C., 84; 29 S. C., 533; 95 S. C., 491; 106 S. C., 10; 33 S. C., 385. *No part performance:* 37 Cyc., 644, 645; Bail., Eq., 114. *No mutuality of remedy which is essential:* 36 Cyc., 621; 6 Pom. Eq. Jur., Sec. 769; 41 S. C., 349; Riley Eq., 177. *Act of President not binding on corporation in absence of corporate action:* 175 U. S., 40; Cook, Corp., Secs. 716, 670.

January 9, 1924.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

1-5 For the reasons stated by his Honor, Special Judge C. M. Efird, his decree is affirmed.

---

## 11403

### STATE v. PERRY

(121 S. E., 204)

1. CRIMINAL LAW—RECORD HELD TO SHOW NO ABUSE OF TRIAL COURT'S DISCRETION IN REFUSING NEW TRIAL.—The record *held* to show that there was no abuse of discretion in refusing defendant's application for a new trial on the grounds of newly discovered evidence, notwithstanding the introduction of improper affidavits by the State.

2. CRIMINAL LAW—ON APPLICATION FOR NEW TRIAL, STATE'S AFFIDAVITS NOT AFFECTING CREDIBILITY NOT CONSIDERED.—On the hearing of an application for a new trial affidavits offered by the State setting out acts of violence on defendant's part, not charging an offense that affected credibility, should not be considered.

Before DENNIS, J., Darlington, Summer Term, 1923. Affirmed.

E. R. Perry was convicted of an assault with intent to kill, and from an order refusing his application for a new trial, he appeals.

*Messrs. Mendel L. Smith* and *W. L. Stokes,* for appellant, cite: *Motion for new trial on the ground of after discovered evidence was rarely granted in early judicial*